IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:22-CV-7-FL

| | | |
|---|---|---|
| I.M. and T.R. by and through their respective Guardians Ad Litem, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| GRANVILLE COUNTY SCHOOLS; DR. ALISA R. MCLEAN in her official capacity as Superintendent of Granville County Schools; and DAVID RICHARDSON, in his official capacity as Chairman of the Granville County Board of Education, | ) ) ) ) ) ) ) ) | ORDER |
| Defendants. | ) ) | |

This matter is before the court upon defendants' motion to dismiss for lack of subject matter jurisdiction and failure to state a claim, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (DE 7). The issues raised are ripe for ruling. For the following reasons, the motion is granted in part and denied in part.

## STATEMENT OF THE CASE

Plaintiffs, who allege they are students at Granville Central High School, commenced this action November 8, 2021, in Granville County Superior Court, asserting race and sex discrimination claims under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., ("Title VI") and Title IX of the Education Amendments of 1972, 20 U.S.C. 1681, et seq., ("Title IX"), as well as state law claims under the North Carolina Constitution and common law. Plaintiffs

seek compensatory damages, attorneys' fees and costs, and preliminary and permanent injunctive relief.

Defendants filed the instant motion to dismiss, relying upon an affidavit of Melony Coons, records custodian for the North Carolina School Boards Trust. Plaintiffs responded in opposition, and defendants replied, relying upon an affidavit of Beth Day, finance officer for the Granville County Public Schools. In the meantime, the court stayed scheduling activities pending ruling on the instant motion.

## STATEMENT OF FACTS

The facts alleged in the complaint may be summarized as follows. Plaintiffs allegedly "have been the victims of harassment and bullying by students attending Granville Central High School." (Compl ¶ 9). Plaintiff I.M., who is "a 15 year old African American male," began "reporting incidents of harassment, bullying and cyberbullying on social media to teachers, assistant principals and the principal of Granville Central High School [the 'school'] beginning in the first week of September of 2021," at the start of his ninth grade school year. (Id. ¶¶ 1, 14). Plaintiff T.R., who is "a 14 year old African American female," began "reporting incidents of harassment, bullying, cyberbullying, and verbal and physical assault in mid-September of 2021," also the start of her ninth grade school year. (Id. ¶¶ 2, 15).

"Plaintiff I.M.'s mother sent emails to school officials as did Plaintiff I.M. only to be told that no action could be immediately taken." (Id. ¶ 16). "Plaintiff I.M.'s father and mother had subsequent oral and in person communications with school personnel regarding the fact the students have called him 'Gay,' 'N****r,'[1] 'Snitch,' and other derogatory terms while threatening to do him physical harm both at school and on social media." (Id. ¶ 17).

---

[1] The court has altered this term throughout this order due to its "most offensive" nature. E.g. United States v. Bartow, 997 F.3d 203, 208-09 (4th Cir. 2021) (quotations omitted).

2

"Plaintiff T.R.'s mother has called the school on multiple occasions requesting to speak with the principal and assistant principal regarding harassment, bullying and cyberbullying of her daughter." (Id. ¶ 18). According to the complaint, "[p]laintiff T.R. has been called 'N****r,' 'Ugly' and a lover of gays in reference to her friendship with I.M., and [was] told that she would be beat up along with I.M., if she and others continued to remain friends with I.M." (Id. ¶ 19). "Plaintiffs identified the students they allege to have communicated threats, harassed, bullied, and cyberbullied them to school officials on several occasions." (Id. ¶ 20).

According to the complaint, "the students identified by [p]laintiffs have and continue to engage in violent acts at school." (Id. ¶ 21). Allegedly, "it was known by other students that the harassers, bullies and cyberbullies intended to attack [p]laintiffs on or about the 27th day of September 2021." (Id. ¶ 22). According to the complaint, "the identified harassers conspired to harass physically assault and batter [p]laintiffs on the 27th day of September 2021." (Id. ¶ 23). "[T]he harassers videotaped their attacks on [p]laintiffs for the purpose and intent of posting the same to SNAPCHAT and other social media, as they have done in the past." (Id. ¶ 24).

"On September 27, 2021, [p]laintiffs were in fact attacked in math class by T.D. one of the harassment conspirators." (Id. ¶ 25). "As a result of the attack by T.D. the school" allegedly "sent [p]laintiffs to ISS[2] for defending themselves after being struck by paper and pens or pencils thrown by T.D. and other harassment conspirators in the math class." (Id. ¶ 26). "Instead of dealing with the situation when it was made known to her, the math teacher simply called the assistant principal who removed all the students involved, including [p]laintiffs who were the victims of physical and verbal assault." (Id. ¶ 27). "Plaintiffs were initially placed in ISS and during this detention

---

[2]      Plaintiffs do not specify in the complaint the meaning for this acronym, but it is reasonable to infer from the context that it refers to In School Suspension.

3

Plaintiffs contacted their parents to come to the school." (Id. ¶ 28). "Plaintiffs parents arrived at the school within 15 minutes of notification." (Id. ¶ 29). Plaintiff "T.R.'s mother was made to wait approximately 20 minutes outside the school before she was permitted to speak with anyone." (Id. ¶ 30). "The principal of the school came out and spoke to T.R.'s mother and I.M.'s mother and father who had arrived at the school by the time the principal came out of the building." (Id. ¶ 31). "Plaintiffs were subsequently released to return to class with the school's assistant principal later determining that evening that [p]laintiffs would be required to serve the ISS beginning the following day." (Id. ¶ 32).

"After being released to return to class, [p]laintiff T.R. went to the weight room for her P.E. class." (Id. ¶ 33). "Plaintiff I.M. who was permitted to meet his parents while they were speaking with the principal was allowed to walk back to the P.E. class at [some] point later than T.R." (Id. ¶ 34). "Upon arrival in the weight room [plaintiffs] I.M. and T.R. moved closer to each other." (Id. ¶ 35). "At that time, the other harassment conspirators who [p]laintiffs had previously identified as their harassers, bullies and cyberbullies and who were in support of T.D.'s actions earlier that day began making comments to them about the events in math class." (Id. ¶ 36). According to the complaint, "these same harassment conspirators demanded that [p]laintiffs come over to speak with them." (Id. ¶ 37). "Plaintiff I.M. complied with their request realizing that if he did not the derogatory name calling would continue." (Id. ¶ 38).

"A white male student, identified by [d]efendants as 'Student l,'" allegedly "began talking to [p]laintiff I.M. calling him derogatory names." (Id. ¶ 39). "Plaintiff I.M. began walking away and the white male student pushed [p]laintiff I.M. in the back." (Id. ¶ 40). "Plaintiffs attempted to walk away from the group of harassment conspirators when the white male student pushed [p]laintiff I.M. in the back again and hit [p]laintiff T.R. in the head." (Id. ¶ 41). "Immediately

4

after the assaults against [p]laintiffs by the white male student, [p]laintiffs began to defend themselves while yelling and screaming at the white male assailant." (Id. ¶ 42). According to the complaint, a "teacher was unavailable and/or unwilling to protect [p]laintiffs from the white male assailant." (Id. ¶ 43). "Meanwhile, the harassment conspirators began recording the fight instigated by the white male student and the other harassment conspirators." (Id. ¶ 44). "The harassment conspirators and the white male student," allegedly, "intended to provoke a fight with [p]laintiffs so they could post the fight on social media, as had been their custom and practice throughout the school year." (Id. ¶ 45).

According to the complaint, "[t]he P.E. teacher broke-up the fight and [p]laintiffs were sent home while the school performed an alleged investigation." (Id. ¶ 46). On September 28, 2021, plaintiff I.M. "was sent a formal written Notice of Disciplinary Action that he would be suspend[ed] for 10 days with the recommendation for long-term suspension for Physical Assault on a Student by Two or More Students." (Id. ¶ 47). "Prior to [a] hearing neither [p]laintiff T.R. nor her mother have received any formal written Notice of Disciplinary Action." (Id. ¶ 48).

"On September 29, 2021, [p]laintiffs through [their] counsel requested a hearing on the suspensions, noting that state and school board policies had not been followed and requesting copies of their educational records, including copies of all video recordings and documents contained in the students' files including emails." (Id. ¶ 50). "To date neither [p]laintiffs nor their respective parents nor their legal counsel have received any emails sent by [p]laintiffs to the school or by officials from the school documenting the complaints of [p]laintiffs that may shed light upon the actions of the harassment conspirators relevant to the long-term suspension hearing." (Id. ¶ 51).

5

Prior to the hearing, plaintiffs "requested that [defendants] make witnesses available that would support [plaintiffs'] claims of the alleged events and potentially rebut the statements of [p]laintiffs' accuser, the white male student." (Id. ¶ 54). Plaintiffs "provided [d]efendants through their counsel with a list of proposed witnesses." (Id. ¶ 55). "In response to this request, [p]laintiffs were informed that [defendants] would not make any student witness available without parental consent, which had to be obtained by [p]laintiffs and provided to the school prior to the hearing." (Id. ¶ 56). Defendants "further required [p]laintiffs to disclose the basis of the information to be sought from teachers and administrators prior to permitting them to appear at the hearing." (Id. ¶ 57). "Plaintiffs through their counsel timely objected to these requirements as [defendants] utilized written statements of students upon information and belief without first obtaining the written consent of their parents and written statements of teachers and administrators, which it intended to utilize at the long-term suspension hearing." (Id. ¶ 58).

In a September 29, 2021, letter, plaintiffs' "counsel requested that all records be provided prior to October 11, 2021, the date of [their] return and the putative 10th day of [p]laintiffs' suspension." (Id. ¶ 59). "The records were not made available during this period and when educational records were provided emails and other documents were omitted." (Id. ¶ 60). Plaintiffs "also requested that they be permitted to continue to receive their assignments, and take quizzes and tests while being suspended." (Id. ¶ 61). "Plaintiff I.M. received work assignments from only one teacher his language arts teacher prior [to] Friday, October 15, 2021." (Id. ¶ 62). On Friday, October 15, 2021, plaintiffs "received approximately 20 assignments from the math teacher, which were due on October 15, 2021 the final day of the semester." (Id. ¶ 63). "The hearing in this matter was scheduled outside of the 10th day" and allegedly beyond defendants' "statutory authority . . . without the consent of [p]laintiffs." (Id. ¶ 65).

Plaintiffs have and continue to suffer "severe emotional distress" allegedly "from the inaction of [defendants] and their employees . . . related to the harassment and bullying occurring at the school such that [they are] afraid to return to the school for fear of additional assaults," and they suffer from sleeplessness, anxiety, and are prone to crying spells. (Id. ¶¶ 66-67). According to the complaint, "[d]efendants and their employees failed to report the actions of the cyberbullies to law enforcement upon receipt of information regarding the same." (Id. ¶ 68). As of the time of the complaint, on November 8, 2021, "[p]laintiffs have not been permitted to return to school." (Id. ¶ 69).

"Plaintiffs' long-term suspension hearing was held by [d]efendants [on] October 19, 2021, with a hearing officer and [d]efendant" Dr. Alisa R. McLean ("McLean"), superintendent of Granville County Schools, present. (Id. ¶ 70). At the hearing, plaintiffs "were tried together." (Id. ¶ 71). They "objected to the use of witness statements, which they were unable to rebut through cross-examination." (Id. ¶ 72). Defendants "choose to only use the witness statement of the white male student who appeared at the hearing via video conference." (Id. ¶ 73). "Plaintiffs' counsel was precluded from continuing to examine the white male student although he admitted to bullying and calling [p]laintiff T.R. 'ugly' and other unflattering names through the school year, including days prior to the incident, which [p]laintiff T.R. had reported to school officials." (Id. ¶ 74). The "P.E. teacher admitted that he did not see what precipitated the incident and did not see the white male student with the urging of the harassment conspirators push and/or strike [p]laintiffs prior to the start of the video used in the proceeding." (Id. ¶ 75).

"During the hearing, the [a]ssistant [p]rincipal responsible for discipline admitted that he did not interview students in the classroom who may have had a different perspective on the incident." (Id. ¶ 76). "Plaintiffs' witness list offered at least three female students in the P.E.

classroom with versions of the incident that differed significantly from that of the white male student and his harassment conspirators, however, [defendants] refused to allow them to be heard at the hearing." (Id. ¶ 77). "Plaintiffs' were precluded by the hearing officer from asking the Assistant Principal [whether] the discipline was based upon the statements of the white male student and the harassment conspirators." (Id. ¶ 78). The hearing officer allegedly "deferred to counsel for [defendants] in making decisions regarding issues of import to the proceeding [allegedly] affecting [p]laintiffs' substantial and procedural due process rights." (Id. ¶ 79). Plaintiffs allegedly "submitted cogent and competent evidence that contradicted the statements of the white male student, his harassment conspirators, and the portion of the video released by the harassment conspirators on the [school's] fight website." (Id. ¶ 80).

Defendant McLean rendered a "written decision against Plaintiff I.M." on October 25, 2021. (Id. ¶ 81). "Plaintiff I.M. has been . . . excluded from school because of [defendant] McLean's . . . actions," which plaintiffs allege were improper. (Id. ¶ 82). According to the complaint, the "written decision of [defendant] McLean failed to provide written findings of fact as determined by the hearing officer consistent with the disciplinary statute, which impermissibly forced Plaintiff I.M. to appeal the determination to Defendant GCS' Board of Education without know of the facts that formed the basis of [defendant] McLean's determination." (Id. ¶ 83). Defendant McLean "ordered a 10 day suspension and a disciplinary transfer for [p]laintiff I.M. to Phoenix Academy, a district alternative school, in an effort to silence his concerns raised by his complaint of harassment and bullying." (Id. ¶ 84).

As of November 2, 2021, defendants have not "provided [p]laintiff T.R. with written notice of a disciplinary decision." (Id. ¶ 85). "Plaintiff T.R. has and continues to be barred from [the school] without written justification or cause." (Id. ¶ 86). "Plaintiff T.R. has not been provided a

written determination or an opportunity to appeal [defendant] Mclean's determination but rather was called by the hearing officer over the weekend and orally told that she has been suspended from school for the remainder of the semester and will be able to return to Phoenix Academy at the start of the second semester." (Id. ¶ 87).

According to the complaint, "the Phoenix Academy is an alternative school, which is comprised primarily of African American students for alleged disciplinary actions." (Id. ¶ 88). Allegedly, "very few white students are disciplinarily assigned to Phoenix Academy for the substantially the same offenses alleged against [p]laintiffs." (Id. ¶ 89). "[T]he quality of instruction and the educational opportunities of students are substantially different from those offered in [defendants'] traditional public schools, as evidenced by substantially lower test scores and student outcomes." (Id. ¶ 90). Phoenix Academy allegedly "does not offer its students a 'sound basic education.'" (Id. ¶ 91). "[T]he white male student was not disciplined or removed from school based upon his actions related to the incident." (Id. ¶ 92).

## COURT'S DISCUSSION

A.     Standard of Review

A motion to dismiss under Rule 12(b)(1) challenges the court's subject matter jurisdiction. Such motion may either 1) assert the complaint fails to state facts upon which subject matter jurisdiction may be based, or 2) attack the existence of subject matter jurisdiction in fact, apart from the complaint. Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982). When a defendant challenges the factual predicate of subject matter jurisdiction, a court "is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." Richmond, Fredericksburg & Potomac R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991). The nonmoving party in such case

"must set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists." Id.

"To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. In evaluating whether a claim is stated, " [the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider " legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009).[3]

B.    Analysis

1.    Proper Party Defendant

Defendants move to dismiss all claims against defendants in their official capacity as duplicative, and they move to dismiss all claims against defendant Granville County Schools as an improper defendant.

"[A] governmental entity may only be sued if the law of the state in which the court is located permits it." Smith v. Munday, 848 F.3d 248, 256 (4th Cir. 2017). In addition, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity" whom the official represents. Kentucky v. Graham, 473 U.S. 159, 166 (1985). "It is not a suit against the official personally, for the real party in interest is the entity." Id. (emphasis in original). Accordingly, for example, in Love-Lane v. Martin, 355 F.3d 766 (4th Cir. 2004), the "district court

---

[3]    Throughout this order, internal citations and quotation marks are omitted from citations unless otherwise specified.

correctly held that [a] claim against [a defendant] in his official capacity as Superintendent [of a North Carolina public school system] is essentially a claim against the Board [of Education]." Id. at 783.

Under North Carolina law, "[t]he board of education of each county in the State shall be a body corporate by the name and style of 'The .......... County Board of Education," and it "shall . . . be capable of . . . defending suit . . . against the corporation." N.C. Gen. Stat. § 115C-40. In contrast, county school systems are not described as cognizable legal entities. See N.C. Gen. Stat. § 115C-74. "All powers and duties conferred and imposed by law respecting public schools, which are not expressly conferred and imposed upon some other official, are conferred and imposed upon local boards of education." N.C. Gen. Stat. § 115C-36.

Based on these authorities, the Granville County Board of Education is the proper defendant in this action. Claims against Granville County Schools must be dismissed. At the same time, claims against defendant McLean in her official capacity as superintendent of Granville County Schools, and against David Richardson in his official capacity as chairman of the Granville County Board of Education, must be treated instead as claims against the entity that they represent, the Granville County Board of Education. Graham, 473 U.S. at 166; Love-Lane, 355 F.3d at 783. The court thus construes plaintiffs' claims against them instead as claims solely against the Granville County Board of Education.

Defendants' suggestion that the suit as a whole must be dismissed because plaintiff did not name Granville County Board of Education as the proper defendant is unavailing under the circumstances of this case. In particular, by asserting claims against defendants McLean and Richardson in their official capacities, plaintiffs have, in "all respects other than name," brought a "suit against the entity" they represent, the Granville County Board of Education. Graham, 473

11

U.S. at 166; see Love-Lane, 355 F.3d at 783.  Moreover, defendants do not contest proper service upon defendant Richardson, as chair of the Granville County Board of Education, and service upon him in that capacity qualifies as service upon the Board.  See N.C. Gen. Stat. § 1A-1, Rule 4(j)(5)(c).

Accordingly, the clerk is directed to modify the caption in the court's docket to reflect that Granville County Board of Education is the sole defendant going forward in this case, in the place of defendants McLean and Richardson.  Defendant Granville County Schools is dismissed as an improper defendant, and defendants McLean and Richardson are dismissed as duplicative of defendant now designated as Granville County Board of Education.  For ease of reference, for purposes of addressing the remainder of the issues raised by defendants' motion, the court will continue to refer to "defendants" in the plural, understood to be in all respects other than name defendant Granville County Board of Education.

2.    Title VI and Title IX Claims (counts four and five)[4]

Defendants argue that plaintiffs' Title VI and Title IX claims should be dismissed for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6).  The court agrees in part.

Title VI provides that "[n]o person . . . shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  Title IX similarly provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).

---

[4]    Where removal in this case was premised on federal question jurisdiction, the court begins with analysis of plaintiffs' federal claims.

Title IX "was modeled after Title VI . . ., which is parallel to Title IX except that it prohibits race discrimination, not sex discrimination, and applies in all programs receiving federal funds, not only in education programs," meaning "[t]he two statutes operate in the same manner." Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 286 (1998).  As such, the court applies cases interpreting Title VI and Title IX, or both, interchangeably to plaintiffs' claims under Title VI and Title IX.  Plaintiffs suggest two theories of relief under these statutes in the allegations of the complaint: a) student-on-student harassment, and b) discriminatory discipline, which the court addresses in turn below.

>       a.      Student-on-student harassment

To state a claim on the basis of student-on-student harassment, a plaintiff must plausibly allege that:

> (1) they were a student at an educational institution receiving federal funds; (2) they suffered sexual [or racial] harassment that was so severe, pervasive, and objectively offensive that it deprived them of equal access to the educational opportunities or benefits provided by their school; (3) the school, through an official who has authority to address the alleged harassment and to institute corrective measures, had actual notice or knowledge of the alleged harassment; and (4) the school acted with deliberate indifference to the alleged harassment.

Doe v. Fairfax Cnty. Sch. Bd., 1 F.4th 257, 263–64 (4th Cir. 2021).

In determining whether student-on-student harassment is sufficiently severe or pervasive, courts "must bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults."  Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 651 (1999).  In consequence, "insults, banter, teasing, shoving, pushing and gender-specific conduct that is upsetting to the students subjected to it" are not actionable in the school setting.  Id. at 651-52.  "Damages are not available for simple acts of teasing and name-calling among school children, however, even where these

13

comments target differences in gender." Id. at 652. "It is not enough to show . . . that a student has been teased . . . or called offensive names." Id. "Rather, a plaintiff must establish . . . harassment of students that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities." Id. at 651. Harassment must "hav[e] a systemic effect on educational programs or activities," rather than being a "single instance" of harassment. Id. at 652.

For purposes of the third element, "a school's receipt of a report that can objectively be taken to allege . . . harassment is sufficient to establish actual notice." Fairfax Cnty. Sch. Bd., 1 F.4th at 263. This inquiry "asks whether an appropriate official in fact received such a report or complaint and whether a reasonable official would construe it as alleging misconduct prohibited by Title IX or Title VI. Id. at 268.

Under the fourth element, a school acts with deliberate indifference "where its response . . . or lack thereof is clearly unreasonable in light of the known circumstances." S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cty., 819 F.3d 69, 76-77 (4th Cir. 2016). "[D]eliberate indifference is a high standard that requires more than a showing of mere negligence." Fairfax Cnty. Sch. Bd., 1 F.4th at 271. "[E]ducational institutions have a great deal of flexibility in disciplining students who sexually harass other students," and "an institution is not normally liable for failing to cede to a harassment victim's specific remedial demands." Feminist Majority Found. v. Hurley, 911 F.3d 674, 686 (4th Cir. 2018). At the same time, "a half-hearted investigation or remedial action will not suffice to shield a school from liability." Fairfax Cnty. Sch. Bd., 1 F.4th at 271.

Plaintiffs have alleged sufficient facts to meet the elements of a student-on-student racial harassment claim under Title VI. With respect to the second element, plaintiffs allege that they

"began reporting incidents of harassment, bullying and cyberbullying," in mid-September 2021. In particular, plaintiff I.M. reported to "school officials" that "students have called him . . . 'N****r,' . . . and other derogatory terms while threatening to do him physical harm both at school and on social media." (Compl. ¶¶ 16, 17). Similarly, plaintiff T.R. reported to "school officials" that she "has been called 'N****r'" and "told that she would be beat up along with I.M." (Id. ¶ 19). One of those harassing students, T.D., and "other harassment conspirators" then "attacked" plaintiffs in math class, on September 27, 2021, including by throwing "pens or pencils" and "verbal assault." (Id. ¶¶ 26-27). Later that day, harassers "who were in support of T.D.'s actions . . . began making comments to them about the events in math class." (Id. ¶ 36). "'Student 1' began talking to [p]laintiff I.M. calling him derogatory names," and then pushed plaintiff I.M. and hit plaintiff T.R. in the head. (Id. ¶¶ 39, 41).

These allegations, while presenting a close case, are sufficient to give rise to an inference of severe, pervasive, racial harassment when construing all reasonable inferences in favor of plaintiffs. Although "simple acts of teasing and name-calling among school children," including use of "offensive names," generally are not enough to meet the second element, Davis, 526 U.S. at 651, courts have recognized that use of the derogatory term "N****r" is actionable, if repeated over time. See e.g., Fennell v. Marion Indep. Sch. Dist., 804 F.3d 398, 409 (5th Cir. 2015) ("There is no question . . . that repeatedly 'being referred to by one's peers by the most noxious racial epithet in the contemporary American lexicon, and being shamed and humiliated on the basis of one's race' is harassment far beyond normal schoolyard teasing and bullying.") (quoting Monteiro v. Tempe Union High Sch. Dist., 158 F.3d 1022, 1034 (9th Cir. 1998)); DiStiso v. Cook, 691 F.3d 226, 242–43 (2d Cir. 2012) ("[U]se of the reviled epithet 'n****r,' raises a question of severe harassment going beyond simple teasing and name-calling."); cf. Bartow, 997 F.3d at 207 (stating

that "n****r is the most noxious racial epithet in the contemporary American lexicon," and it "is far more than a mere offensive utterance"). Here, where it is reasonable to infer that this term was used repeatedly, in conjunction with "other derogatory terms while threatening to do . . . physical harm," (Compl. ¶¶ 17, 19), this element is satisfied for purposes of the instant motion.

The third element, notice to "an official who has authority to address the alleged harassment and to institute corrective measures," Fairfax Cnty. Sch. Bd., 1 F.4th at 263, also is satisfied, albeit minimally. The complaint twice references "school officials" as recipients of emails or information regarding threats made to plaintiffs, (Compl. ¶¶ 16, 20), it describes calls attempted to be placed through to the principal and assistant principal, (Compl. ¶ 18), and it describes communications with "school personnel" reporting use of derogatory terms including "N****r," all before the events of September 27, 2021. (Compl. ¶ 17).

The fourth element, deliberate indifference, is satisfied because it may be inferred from the allegations in the complaint that defendants did nothing in response to these reports, (see Compl. ¶¶ 20-21), and "identified harassers" proceeded to physically and verbally assault plaintiffs in math class and P.E. class on September 27, 2021, including through use of "derogatory names." (Compl. ¶¶ 23-39).

In sum, plaintiffs allege sufficient facts to advance a claim of student-on-student racial harassment in violation of Title VI. The same cannot be said for plaintiffs' claim for student-on-student sexual harassment under Title IX. While the derogatory term "n****r" has been singled out in the caselaw, cited above, as supporting a claim for racial harassment under Title VI, the parties have not cited, and the court has not identified, caselaw meriting similar treatment under Title IX for the terms "Gay," "Ugly," and "lover of gays," as alleged in the complaint. (Compl. ¶¶ 17, 19). Rather, these fall under the category of "offensive names" that do not without more meet

the second element of a sexual harassment claim. <u>Davis</u>, 526 U.S. at 651. Accordingly, plaintiffs' claim for student-on-student harassment under Title VI is allowed to proceed, while their claim under Title IX is dismissed without prejudice.

In seeking dismissal of plaintiffs' Title VI claim, defendants point out that "[t]here is no allegation that [plaintiffs] missed any class or school as a result of the alleged name-calling," (Def's Mem. (DE 8) at 17), suggesting that plaintiffs have failed to allege racial harassment sufficiently "severe, pervasive, and objectively offensive that it deprived them of equal access to the educational opportunities." <u>Fairfax Cnty. Sch. Bd.</u>, 1 F.4th at 263. Caselaw cited herein and not referenced by defendants, however, suggests that repeated use of the repugnant epithet "N****r," under some circumstances, may be sufficient in itself to give rise of an inference of deprivation of equal access. <u>See, e.g.</u>, <u>Monteiro</u>, 158 F.3d at 1034; <u>DiStiso</u>, 691 F.3d at 243; <u>but cf.</u> <u>Davis</u>, 526 U.S. at 652 (stating "nor do we contemplate, much less hold, that a mere decline in grades is enough to survive" dismissal). The court thus leaves for a later juncture more comprehensive determination of this issue on a more complete record.

Defendants also argue that plaintiff does not allege "who used [the] repugnant epithet" or "whether it occurred online or during school hours, or whether it happened more than once." (Def's Mem. (DE 8) at 17). As for the latter point, the complaint permits an inference that it happened repeatedly for both plaintiffs, where plaintiff I.M. alleged "students have called him", and plaintiff T.R. alleges she "has been called 'N****r.'" (Compl. ¶¶ 17, 19). Regarding identity, "[p]laintiffs identified the students the allege to have communicated threats . . . on several occasions." (<u>Id.</u> ¶ 20). Concerning where the threats took place, the complaint references threats made "both at school and on social media." (<u>Id.</u> ¶ 17). Taken together, these allegations are sufficient to raise an inference "the school, through an official who has authority to address the

alleged harassment and to institute corrective measures, had actual notice or knowledge of the alleged harassment." Fairfax Cnty. Sch. Bd., 1 F.4th at 263. While there are significant ambiguities and gaps in the complaint's allegations, these issues raised by defendants are more properly addressed at a later juncture upon more complete record.

In sum plaintiffs' student-on-student racial harassment claim under Title VI is allowed to proceed, whereas their student-on-student sexual harassment claim under Title IX is dismissed.

        b.     Discriminatory Discipline

A claim for discriminatory discipline by school administration requires a showing of "discriminatory intent" under both Title VI and Title IX. Brzonkala v. Virginia Polytechnic Inst. & State Univ., 132 F.3d 949, 961 (4th Cir. 1997) vacated on other grounds, 169 F.3d 820 (4th Cir. 1999) (en banc) (Title IX); see Alexander v. Sandoval, 532 U.S. 275, 280 (2001) (stating that Title VI prohibits "intentional discrimination"). In describing the requirements to state such a claim, the United States Court of Appeals for the Fourth Circuit has observed:

> [A]llegations of a procedurally or otherwise flawed school disciplinary proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss. The fatal gap is . . . the lack of a particularized allegation relating to a causal connection between the flawed outcome and gender [or racial] bias. A plaintiff must thus also allege particular circumstances suggesting that gender [or racial] bias was a motivating factor behind the erroneous finding. Allegations of a causal connection in the case of university disciplinary cases can be of the kind that are found in the familiar setting of Title VII cases. Such allegations might include, inter alia, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender.

Brzonkala, 132 F.3d at 961 (quoting Yusuf v. Vassar College, 35 F.3d 709, 715 (2d Cir.1994)). In other words, a claim for discriminatory discipline requires allegations of 1) a procedurally or otherwise "flawed school disciplinary proceeding", 2) that has "led to an adverse and erroneous outcome," and 3) "a causal connection between the flawed outcome and gender or racial bias,"

based on "particular circumstances suggesting that gender [or racial] bias was a motivating factor behind the erroneous finding." Id.; see, e.g., Doe v. Salisbury Univ., 123 F. Supp. 3d 748, 766 (D. Md. 2015) (identifying same elements).

Here, plaintiffs have sufficiently alleged facts giving rise to an inference of discriminatory discipline based on race. First, they have alleged a procedurally or otherwise flawed disciplinary proceeding, in allegedly failing to provide plaintiff T.R. "formal written notice of the proposed long-term suspension," "imposing a standard on [p]laintiffs to obtain the consent of the parents of the witnesses and withholding teacher witnesses that may support their theory of the case," and failing to hold a timely hearing or allow timely return to school, among other alleged procedural flaws. (Compl. ¶¶ 96-99; see id. ¶¶ 51, 58, 60, 72, 74, 76-80, 83, 85-87). Second, they have alleged an allegedly adverse and erroneous outcome, in that they were excluded or barred from school and required to transfer to Phoenix Academy. (Compl. ¶¶ 82, 84, 86-87).

Third, they have alleged a causal connection between the flawed outcome and racial bias, where they allege that "Phoenix Academy is an alternative school, which is comprised primarily of African American students for alleged disciplinary actions," and "very few white students are disciplinarily assigned to Phoenix Academy for . . . substantially the same offenses alleged against Plaintiffs." (Id. ¶¶ 88, 89). In addition, plaintiffs allege that "the white male student was not disciplined or removed from school based upon his actions related to the incident." (Id. ¶ 92). This white male student allegedly instigated the physical assault on September 27, 2021, by calling plaintiff I.M. "derogatory names," and pushing him, and hitting plaintiff T.R., and he allegedly had "intended to provoke a fight with the Plaintiffs so [his coconspirators] could post the fight on social media, as had been their custom and practice throughout the school year." (Id. ¶¶ 39-41, 45). In sum, plaintiffs have alleged that the white male student engaged in comparable or worse

conduct, but was disciplined less than plaintiffs because of his race. Plaintiffs thus state a Title VI claim based upon discriminatory discipline.

By contrast, plaintiffs have not alleged sufficient facts to give rise to an inference of disciplinary discrimination based upon sex, in violation of Title IX. Key to this determination is that plaintiffs have not alleged assignment to Phoenix Academy was based on their sex, or any pattern of disciplinary assignment based upon sex. Without these "patterns of decision-making that also tend to show the influence of gender," the remaining allegations are insufficient standing alone to comprise "particular circumstances suggesting gender bias." Brzonkala, 132 F.3d at 961. In addition, comparison between the white male student and plaintiffs is less apt with respect to sex than race, because plaintiff I.M. is also male. The remaining difference in sex between plaintiff T.R. and the white male student, or references to plaintiffs as "gay" or "lover of gays," without more, is insufficient to meet the standard of "a particularized allegation relating to the causal connection between the flawed outcome and gender bias." Id. Plaintiffs' claim under Title IX based on discriminatory discipline thus fails as a matter of law.

With respect to plaintiffs' race discrimination claim under Title VI, defendants argue that the white male student "will not suffice for comparator purposes, as there is no allegation that he participated in a two-on-one assault, the misconduct for which Plaintiffs were suspended." (Defs' Mem. (DE 8) at 18). This argument, however, does not credit all reasonable inferences that may be drawn from the allegations in the complaint. It is reasonable to infer that the white male student was alleged to have instigated the assault against plaintiffs, engaged in the first acts of physical and verbal assault against them, and premeditated the assault in conspiracy with other harassers with the intent to broadcast selected portions of the fight on social media. (See Compl. ¶¶ 39-41,

20

45). Viewed in this light, the white male student is a sufficient comparator for purposes of the instant clam, based upon the allegations in the complaint.

In sum, plaintiffs' claim for discriminatory discipline based on race, in violation of Title VI, is allowed to proceed. Plaintiffs' claim for discriminatory discipline based on gender, in violation of Title IX, is dismissed.

3.     State Constitutional Claim

Plaintiffs assert in count one of the complaint that defendants engaged in a "negligent violation of plaintiffs' due process rights," set forth in the North Carolina Constitution and N.C. Gen. Stat. § 115C-390.8. (Compl. p. 13). Defendants argue that this claim must be dismissed for failure to exhaust administrative remedies. The court agrees.

"To assert a direct constitutional claim against [a board of education] for violation of his procedural due process rights, a plaintiff must allege that no adequate state remedy exists to provide relief for the injury." Copper ex rel. Copper v. Denlinger, 363 N.C. 784, 788 (2010). The North Carolina General Statutes "allow an appeal to the [b]oard [of education], and then to superior court, from any final administrative decision related to student discipline and from a suspension lasting in excess of 10 school days." Id. For example these statutes set forth procedures for an appeal "to the local board," and then for "judicial review in accordance with Article 4 of Chapter 150B of the General Statutes." N.C. Gen. Stat. § 115C-390.8(g) & (i). As such, a plaintiff challenging for procedural or substantive due process violation a school disciplinary determination must exhaust administrative remedies before bringing a direct claim under the North Carolina Constitution. See id.

Here, plaintiffs fail to allege in their complaint that they exhausted administrative remedies to appeal the challenged disciplinary decisions. (See Compl. ¶¶ 93-101). Accordingly, plaintiffs' claims under the North Carolina Constitution must be dismissed.

Plaintiffs nonetheless suggest that they should be excused from the exhaustion requirement because plaintiff T.R. "was not provided with the written decision of Defendant McLean" prior to commencement of this action, and plaintiff I.M. had "already been suspended beyond 10 days" prior to his due process hearing. (Pls' Mem. (DE 13) at 8). These assertions, however, do not tend to show it "would have been futile to attempt to appeal [their] suspensions to the [b]oard [of education]," or to petition the state court for judicial review of any administrative decision. Copper, 363 N.C. at 789. "Thus . . . an adequate remedy exists at state law to redress the alleged injury, and this direct constitutional claim is barred." Id.

Accordingly, plaintiffs' claim under the North Carolina Constitution is dismissed for failure to exhaust administrative remedies.

4.      State Law Negligence Claims

Plaintiffs assert two state law negligence claims based upon a failure to protect and based upon failure to provide assignments. Defendants argue that these claims must be dismissed for lack of subject matter jurisdiction due to governmental immunity. The court agrees.

"Unless and until a school administrative unit has waived its immunity by procuring an applicable policy of liability insurance, it may not be held responsible . . . for the intentional torts of its employees." Presnell v. Pell, 298 N.C. 715, 721 (1979). "[I]n the absence of an allegation in the complaint in a tort action against a . . . board of education, to the effect that such board has waived its immunity by the procurement of liability insurance to cover such alleged negligence or tort, or that such board has waived its immunity as authorized" in the North Carolina General

22

Statutes, such a claim must be dismissed. <u>Fields v. Durham City Bd. of Ed.</u>, 251 N.C. 699, 701, (1960). A "[g]overnment's potential immunity from suit affects [the court's] jurisdiction." <u>Medina v. United States</u>, 259 F.3d 220, 223 (4th Cir. 2001); <u>Myers v. McGrady</u>, 360 N.C. 460, 465 (2006) (recognizing the "sovereign immunity bar [is] fatal to jurisdiction").

"A local board of education may incur liability pursuant to this section only with respect to a claim arising after such board of education has procured liability insurance pursuant to this section and during the time when such insurance is in force." N.C. Gen. Stat. § 115C-42. "Any local board of education, by securing liability insurance as . . . provided [in § 115C-42 of the North Carolina General Statutes], is hereby authorized and empowered to waive its governmental immunity from liability for damage by reason of death or injury to person or property caused by the negligence or tort of any agent or employee of such board of education." <u>Id.</u> "Such immunity shall be deemed to have been waived by the act of obtaining such insurance, but such immunity is waived only to the extent that said board of education is indemnified by insurance for such negligence or tort." <u>Id.</u>

In turn, § 115C-42 requires that "[a]ny contract of insurance purchased pursuant to this section shall be issued by a company or corporation duly licensed and authorized to execute insurance contracts in this State or by a qualified insurer as determined by the Department of Insurance and shall by its terms adequately insure the local board of education against liability for damages by reason of death or injury to person or property proximately caused by the negligent act or torts of the agents and employees." <u>Id.</u>

Here, plaintiffs do not allege that defendants purchased a "contract of insurance . . . issued by a company or corporation duly licensed and authorized to execute insurance contracts," which "by its terms adequately insure[s] the local board of education against liability for damages" cause

23

by negligent acts or torts of its agents and employees. Id. Rather, plaintiffs allege that defendants "waived governmental immunity and/or sovereign immunity to the extent that it has obtained insurance and/or participates in a risk pool that covers certain acts or omissions by its members of participants pursuant to N.C. Gen. Stat. § 115C-42." (Compl. ¶ 8) (emphasis added). This is a conclusory allegation that need not be accepted upon defendants' motion challenging jurisdiction over these claims. In any event, plaintiffs have not "set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists" regarding immunity, Richmond, Fredericksburg & Potomac R. Co., 945 F.2d at 768, where the court must at this juncture accept the affidavits of Melody Coons and Beth Day regarding the limits on defendants' liability coverage. (See DE 8-1 ¶ 3; DE 14-1 ¶ 3).

In sum, plaintiffs' negligence claims must be dismissed for lack of subject matter jurisdiction due to governmental immunity.

5. Injunctive Relief

Defendants move to dismiss plaintiffs' claims for injunctive relief on the basis that they are moot. (Defs' Mot. (DE 7) at 2). Count six of the complaint seeks "temporary restraining order, preliminary injunction and permanent injunction," for an asserted violation of plaintiffs' "substantive and procedural due process rights" under the North Carolina Constitution and state law. (Compl. ¶ 127). Where the court has dismissed plaintiffs' claim under the North Carolina Constitution and state law for failure to exhaust administrative remedies, plaintiffs' request for injunctive relief based thereon fails as a matter of law.

Plaintiffs' claim for injunctive relief accordingly is dismissed without prejudice.

## CONCLUSION

Based on the foregoing, defendants' motion (DE 7) is GRANTED IN PART and DENIED IN PART. Plaintiffs' Title VI claim (count four) is allowed to proceed. All other claims asserted by plaintiffs are DISMISSED WITHOUT PREJUDICE for failure to state a claim upon which relief can be granted and for lack of subject matter jurisdiction, as set forth herein. Defendant Granville County Schools is DISMISSED as an improper defendant. The clerk is directed to modify the caption in the court's docket to reflect that Granville County Board of Education is the sole defendant going forward, and that defendants McLean and Richardson are DISMISSED as duplicative of defendant Granville County Board of Education. The court lifts the stay of scheduling activities imposed January 21, 2022, and defendant Granville County Board of Education is DIRECTED to file a responsive pleading within 14 days of the date of this order.

SO ORDERED, this the 16th day of August, 2022.

LOUISE W. FLANAGAN
United States District Judge

25